**CLEM LUMBER CO. v. CARSON.**

No. 13220.

Court of Civil Appeals of Texas. Dallas.

July 3, 1942.

Rehearing Denied Sept. 25, 1942.

Kennemer & Armstrong, of Dallas, for appellant.

Crane & Crane, of Dallas, for appellee.

BOND, Chief Justice.

Appellant, Clem Lumber Company, a corporation, instituted this suit against appellee, G. E. Carson, for the amount owing on a promissory note, and for foreclosure of liens on 55 shares of capital stock of the corporation, delivered and pledged to it under a collateral agreement attached to and made a part of the note; and, in the alternative, for the balance owing on the note after crediting the amount realized from the sale or transfer of the stock to the corporation under the collateral agreement. The defense is based on alleged acts of conversion by the corporation of the pledged security, in that, it appropriated the stock at a value much less than its intrinsic worth, hence, in the absence of market value, the defendant is entitled to credit greater than the face of the note, and seeks judgment for the cancellation of the note, the excess payment, and the value of two declared dividends on the stock—2% and 8% respectively—aggregating the sum of $1,457.92.

The cause was tried to a jury on issues: (1) To find the intrinsic value, that is, the "true, inherent and essential value" of the 55 shares of stock pledged to the Clem Lumber Company; to which the jury found, $85 per share. (2) To find whether or not there was a sale of the stock, that is, "a contract between parties to give and pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought or sold"; to which the jury answered "No." (3) To find whether "$68 per share equaled or exceeded the actual value of the 55 shares of stock"; to which the jury answered "No." (4) To find whether Carson was advised by an official of the Clem Lumber Company that the stock would be taken by the Company at a value of $68 per share, "in the event he did not voice objection to such procedure by February 25, 1939"; to which the jury answered "No." And (5) to find whether Carson relinquished his claim to a dividend declared on the stock, by endorsing and returning to the corporation a check given therefor; and whether he agreed that the amount of the dividend might be transferred by the Company to its surplus account; to which the jury answered "No." On this verdict, the trial court entered judgment against the plaintiff, cancelling the note in suit, and in favor of the defendant, against the plaintiff, for the sum of $703.07, with interest and all costs of suit.

The evidence pertinent here is undisputed; the charge of the court manifestly presents academic questions of no ultimate issue of fact. The promissory note and the collateral pledge, or agreement, were executed by Carson on January 1, 1935. The note, in the sum of $3,421.33, evincing money loaned, was made payable to the Clem Lumber Company, due six months after date, with 8% interest per annum until paid, and the usual contingent attorney's fee of 10% of the principal and interest; the note further providing that, "For the purpose of securing said holder in the payment of this note, when due, the undersigned hereby pledge, transfer and deliver to said holder the following property, towit: Stock Certificate #1099 for 55 shares of the capital stock of the Clem Lumber Company." The collateral agreement provides (material here): That upon failure of the maker to perform in keeping with the terms of the note, "the holder is authorized and empowered, without either demand, advertisement or notice of any kind, to sell at public or private sale, the whole or any part of the securities then held by said holder in pledge hereunder, and transfer and deliver same to the purchaser or purchasers thereof, and receive the proceeds of sale. Said holder to have the same right to purchase at said sale as a stranger. * * * This instrument and all rights and powers hereunder, together with the securities then held in pledge hereunder may be transferred and assigned by said holder at such time and upon such terms as said holder may deem advisable; and such assignee shall succeed to all the rights and powers of said holder hereunder." There is no question raised in pleading or proof that the note, or any interest thereon, was paid, other than as hereinafter stated, or that the holder thereof was not authorized to declare the indebtedness due, or that it did not have the right to exercise the privileges incident to the holder of the note in respect to the security pledged. The rights of the parties in and to the securities are determinable by contract. It will be observed that the holder of the note was, by the terms of the agreement, expressly authorized to purchase the stock certificate and have the stock transferred and assigned at such time and upon such demand as the holder of the note deemed advisable, limited

only, in law and equity, to act fairly and in good faith in the premises, and in such way as to subserve the pledgee's rights, as well as the interest of the pledgor. The contract evinces no agreement or obligation of the purchaser, transferer or assignee to purchase the stock certificate at a "true, inherent and essential value," as expressed in the question asked the jury; nor is any obligation imposed upon the purchaser to seek advice or to secure the approval of the pledgor in effecting a transfer of the stock, and certainly, a "sale" of the stock, as presented by the record, must be determined on a question of law and not of fact; so, also, must the intention of the stockholders, in relinquishing a dividend and agreeing to a transfer of such dividend to the Company's surplus or working capital. The intention of the stockholder and his agreement must be determined by his acts or spoken words.

The record shows that in the fall of 1938, or in January, 1939, appellant corporation, being the owner and holder of the note in suit, as well as of many other notes of similar import, declared, by resolution of its Board of Directors, that "all notes held by Clem Lumber Company from its stockholders and secured by Company stock placed as collateral to be due, and hereby direct that notice be mailed immediately to each stockholder so indebted, advising that his note had been declared due and that if payment of the note or notes shall not be made within 30 days of such notice, then the Clem Lumber Company stock pledged as security with the note will be sold and the proceeds applied to the satisfaction of the indebtedness in such manner as may be fair and equitable to the Company; and the Company is hereby authorized to bid and/or buy such stock at public or private sale and to place any stock so purchased with the Treasury Stock." Subsequently, on January 30, 1939, Mr. Clem, President of the corporation, wrote Mr. Carson: "Dear George: The Directors have instructed me to make some disposition of all our stock loans and we have notified each one, including myself, that settlement will have to be made by Feb. 25, 1939. I believe it would be best for you to come up and let's see if some settlement can be worked out so that there will not be any balance hanging over you. While your loan was not a stockholders loan, at the time it was made, nor based on a certain percent of stock owned, as was the case with all the others, still I would try to work out a price for your stock in line with the settlement we make with the others, provided you are interested in trying to settle on an equitable basis. Your note is dated January 1, 1935, and was due six months later. The face of the note is $3421.33. Interest to Feb. 1, 1939, 4 yrs. & 1 mo. @ 8% $1117.64 (total) $4538.97: Less credits as follows: Dec. 31, 1937, part of dividend $78.72. Interest on same to Feb. 1, 1939, $6.82 (total) $85.54. Net balance $4453.43. If the note is not paid by Feb. 25, 1939, the 55 shares of Company stock you put up as collateral will be disposed of according to the collateral agreement and the proceeds applied to the credit of the note, but as stated above, I think it would be best for all concerned that you come up and let's try to work out the most satisfactory settlement possible. I will appreciate a prompt reply." And on February 24, 1939, Mr. Clem again wrote Mr. Carson: "Dear George: It will be necessary to make settlement of your note at once as the time limit is up tomorrow. I have not had time to try to find any cheap price stock for you, but I judge you could attend to that later. I don't know what price the Directors will allow you for your stock, if you fail to accept the price they are offering those who have settled willingly, and I think almost everyone but you has come in and settled. So please advise by return mail as we don't want to take judgment against you for the deficit. Yours very truly, Clem Lumber Company."

And then on February 25, 1939, the Directors of the corporation authorized the purchase of the stock at $68 per share, only to the extent that such shares so purchased would, when credited to the notes, liquidate the indebtedness; that any excess stock should be returned to stockholders, and any deficiency paid by stockholders, or closed by note. Mr. Carson's stock, as well as that of all other stockholders similarly situated, was transferred to the Company and thereafter carried on the books of the corporation as treasury stock, and the amount of this stock (55 shares) calculated on the basis of $68 per share, was duly credited on his note. All stockholders thus affected voiced approval of the transaction except Mr. Carson, who made no protest. He testified: "Q. Did you ever talk to them (the Directors) about any definite amount? A. It seems like I did when I first was told that it was $68, but I wouldn't know—I

cannot state positively I did, but I think I did, and I didn't accept the $68 though." However, Mr. Carson admitted that he received the two letters (recited above) and that he made no reply to either of them; and furthermore, the record is devoid of evidence that Carson ever protested as to the manner in which his stock was transferred and assigned to the Company, although he was present in the stockholders' meetings when the plan was devised, fully discussed, and eventually carried into effect.

We think the evidence is conclusive that the Company dealt fairly and in good faith with Mr. Carson; there are no pleadings or proof to the contrary. As further evidence of this, Mr. Carson sold his mother's stock in the corporation for $40 a share, and a very short time before, Mr. Clem purchased 1,100 shares at $25 per share. It is in evidence that there was no market value for such stock, that there were no purchasers at any price outside the corporation itself. Mr. Carson made no effort to redeem his security or to pay his indebtedness, but, on the contrary, offered evidence on trial tending to discredit the corporation; to show that it was insolvent, or near a state of liquidation; inefficiently managed by the Clem Household and relatives as directors, making the stock undesirable. Manifestly, the corporation was under no obligation to purchase the Carson stock at its intrinsic value, and evidently it did not wish to do so. The mere fact that the stock had a book value in excess of that placed upon it by the corporation ($68 per share) evinces no subversive act on the part of the corporation in dealing with the Carson stock.

On the issue raised by appellee that he was entitled to a credit on his note for the 2% and 8% dividends declared by the Directors on the 55 shares of stock in question, the evidence is uncontroverted: On December 31, 1937, the 2%, $110, was authorized on the stock, and the record shows that $31.28 of that amount was credited to Carson's open account, and $78.72 to the note in question: and in December, 1936, the 8% dividend, $440, was authorized.

This dividend was not credited to the note, but was transferred to a surplus fund or working capital of the corporation. The corporation had capital stock in the sum of $500,000, and in 1936, its earnings were sufficient to declare an 8% dividend; it had that amount in its treasury. The Directors determined that the financial status of the corporation was not at that time such that it could afford to pay the stockholders the $40,000 from its treasury, and that the corporation could not afford to be penalized for Federal income, or profit tax, by retaining the unallocated dividend. So, to relieve the financial situation, the Directors determined to pay the dividend to the stockholders, and then importune each of them to return the amount, to be placed to the credit of its surplus account. Mr. Carson was fully advised of the situation, and, on December 10, 1936, was mailed a check for his dividend, with letter explaining in detail the plan devised, and was asked to give the $440 dividend back to the Company, to be used in its surplus account. Mr. Carson endorsed the check and returned it to the Company for the purposes intended, of which he was fully cognizant; he made no objection or protest to the plan suggested. In consequence, the dividend on his 55 shares of stock, as well as on all other similar stock, was deposited to the Company's surplus fund, and appropriated to the beneficial interest of the corporation. We do not think, in the circumstances, that Carson was entitled to credit on his note for the dividend thus appropriated; he voluntarily allowed its diversion to the Company's working capital.

In view of our conclusion above expressed, the judgment of the court below is reversed and judgment here rendered in favor of appellant for the sum of $692.71, calculated on the basis of the principal of the note, with 8% interest thereon from January 1, 1935, to this date; credited with (dividend) $78.72, with 8% interest thereon from January 1, 1938, and (stock) $3,740, with 8% interest from February 25, 1939; with 10% attorney's fees, 6% interest until paid, and all costs expended.

Reversed and rendered.